FRUIT DISPATCH CO. *v.* LE SENO.

1. SALES—CONTRACT—DUTY OF BUYER—OBLIGATION TO ACCEPT.
   In an action for the price of a car load of bananas, evidence relative to the contract of purchase, consisting of letters, telegrams, and oral testimony, examined, and *held*, that if a contract evidenced by a certain writing was in force at the time of the sale, the buyer was bound to accept the fruit if of the grade or class ordered, pay for it, and if not satisfactory as to condition or quality, submit a claim for a rebate.

2. SAME—CONTRACT—ABROGATION—EVIDENCE.
   Where a buyer and seller had a contract under which the buyer agreed to accept and pay for fruit shipped him on orders and make a claim for any defect of quality, and it is claimed that that contract was abandoned and another one made under which the buyer was privileged to reject any shipment not of the quality ordered, he did not, by thereafter accepting an unsatisfactory shipment and making a claim, waive the provisions of the second contract, but such conduct at most was evidence to be considered on the question which contract was in force on a later date.

3. SAME—ACTION FOR PRICE—EVIDENCE—SUFFICIENCY.
   In an action for the price of a car load of bananas, evidence examined, and *held*, that whether the car load offered and rejected was "cargo run" as ordered was a question for the jury.

4. APPEAL AND ERROR—RECORD—COSTS—AMOUNT TAXABLE.
   Where plaintiff in error prints a record of 394 pages, substantially a copy of the stenographer's minutes being settled as a bill of exceptions, and the questions of law could have been properly presented with a record of 100 pages, his costs on reversal will be taxed on that basis, though counsel for defendant consented to the settlement of the bill, and the circuit judge certified that where the testimony was set out by question and answer, such course was necessary to a full understanding of the questions of law.

Error to Jackson; Parkinson, J. Submitted November 15, 1906. (Docket No. 35.) Decided February 5, 1907.

Assumpsit by the Fruit Dispatch Company against Nick Le Seno for goods sold and delivered. There was judgment for defendant, and plaintiff brings error. Reversed.

Plaintiff, a fruit importing company, sued defendant, a dealer in fruits at Jackson, Mich., for the price of a car load of bananas, sold to defendant on August 24, 1903, and delivered f. o. b. at New Orleans. The order was given and accepted and fruit refused by wire. The messages are here set out:

"11:48 a. m.         JACKSON, MICH., Aug. 24, 1903.
"FRUIT DISPATCH CO.,
              "Detroit:
 "Send car rejects Mailboat.   Select stock.
                              "N. LE SENO."

"1 p. m.                      Aug. 24, 1903.
"N. LE SENO,
        "Jackson, Mich.:
 "We cannot select fruit for any one.   You must take regular cargo run.   Shall we book your order?   Be quick.
                              "F. B. FORBUSH."

"2:47 p. m.        "JACKSON, MICH., Aug. 24, 1903.
"FRUIT DISPATCH CO.:
 "Send car Mailboat rejects.   Answer.
                              "N. LE SENO."

                              "Aug. 24, 1903.
"NICK LE SENO,
        "Jackson, Mich.:
 "Have booked you car Mailboat rejects.
                    . "FRUIT DISPATCH COMPANY."

                    "JACKSON, MICH., 28 Aug., 1903.
 "Refuse car; poor stock.
                              "N. LE SENO."

                              "28 August, 1903.
"NICK LE SENO,
        "Jackson, Mich.:
 "You must accept car and protect fruit.   If quality poor, file claim.
                    "FRUIT DISPATCH COMPANY."

Testimony was introduced on the part of plaintiff tending to prove that at the time a general agreement existed between the parties, evidenced by the following writing:

"June 12th, 1901.

"NICK LE SENO,
"Jackson, Mich.

"*Dear Sir:* Your favor of recent date received and carefully noted. If we do not insist upon bank guarantee, will you promise to accept fruit, and in case anything is wrong, pay for your fruit and put in a claim? Such claim will be handled promptly by us and if found to be just, will be paid you direct from New York. We will not do business with any one except in this manner. We will not accept a rejection under any circumstances; if there is anything wrong in the quality or condition of the fruit that we are to blame for, we are always willing to pay for same, but the matter must be investigated through our claim department. Please answer this letter and let us know whether you accept this proposition or not. If you do not, it is useless to try to do business with us except by giving us a bank guarantee.

"Yours very truly,
"FRUIT DISPATCH COMPANY,
"Resident Manager."

"FRUIT DISPATCH CO.: I understand and accept the above conditions of your company.

"N. LE SENO."

The declaration alleges, and there was testimony tending to prove, that the fruit delivered was the fruit ordered. It was the theory of counsel for plaintiff that, if bananas known as "reject nines" were delivered, defendant had no right to refuse to accept and pay for the fruit. Defendant introduced testimony tending to prove that the agreement of June 12, 1901, had been abandoned, and was not in force, that the fruit delivered was neither "reject nines" nor "cargo run," and that defendant was at liberty to refuse the fruit even if the said agreement was in force, if the fruit was not "reject nines" or if it was not "cargo run." Upon these opposed theories the case was tried, the jury returning a verdict for the defendant.

Mailboat bananas are those collected at various ports in Central America, principally in Honduras, by the boats of plaintiff company. The fruit is graded, in part at least, according to the number of hands or clusters growing on a single stem; the hands varying in number from 6 to 11, being designated "nines," "eights," "sevens." The witnesses were not quite agreed concerning the tests by which fruit is graded, properly, as "reject nines," or concerning the selection and choosing of the fruit as it goes from the boat to the cars. There is testimony to the effect that, if a bunch of bananas otherwise "nines" is defective because of a malformed or undeveloped hand, or if a hand is torn off or is scarred, it is rejected from the "nines" and is known as a "reject nine." On the other hand, there is testimony supporting the idea that a bunch with a hand torn off or badly scarred or dirty or bearing very thin fruit should not go into "reject nines;" that there is but one grade better than "reject nines" and that is "nines;" that a "reject nine" is a little better than an "eight" and not quite good enough for a "nine." The fruit when loaded in vessels is distributed in compartments according to the number of hands or clusters, and upon arrival at port a diagram showing the location of the fruit and its grade is furnished and used in bringing fruit to the dock and the cars. Some further grading or classing of the fruit is made as it leaves the vessel. A witness described the process of transferring cargo from vessel to cars thus:

"Well, the first thing that is done, the ship is rigged. We have stages in the hatches so the fruit can be passed up, and when the unloading is commenced the bunches are passed up from stage to stage until it reaches the last or top stage. We have there at each hatch—and they are very large hatches—we have one man at each hatch; two men at the large hatches who class that fruit as it was taken out of the ship.

"*The Court:* That is done at Honduras where you are loading?

"*A.* That is done at New Orleans in all cases. A

classer directs the carrier to what car to go with the bunch. The cars are designated by flags, a red flag known as '9 or over,' known as '9's;' a yellow flag designates the 'reject 9's;' a white flag denotes the '8's;' a blue flag denotes the '7's.' The classer at the ship's side starts the carrier off by calling off the flag. He goes to this flag and he meets another inspector, or classer as you wish to term it, who gets a good look at the bunch, and if it is proper allows it to be put into the car. The men on the inside, as we know them as 'car boys,' take hold of the bunch and stow it into the car; that terminates the bunch."

As to the meaning in the trade of " condition," " quality," " cargo run," plaintiff's witness testified:

" *Q.* What do you mean by condition? Does that refer to the quality or don't it?

" *A.* No, it does not. We mean by condition that when fruit is fresh that the same is absolutely green, fresh—there is no ripes, we say it was in fine condition.
\* \* \*

" *Q.* Now, what do you mean by quality as distinguished from condition?

" *A.* Well we grade the size, the fullness, and the cleanliness of the fruit against the quality.

" *Q.* But does that mean whether it has begun to decay or anything of that kind?

" *A.* It has nothing to do with the condition—quality.
\* \* \*

" *Q.* This telegram to Le Seno saying that he would have to take the 'cargo run.' What does that term mean?

" *A.* That term means the fruit as it ran from the cargo subject to rejection or culling out of our inspectors. In other words we don't select, as the fruit comes out of the cargo, good, straight bunches, put into one man's car and give some other man smaller sized bunches, but just as they come with the proper attention paid to culling or rejection in respect to damaged bunches or ripes and that sort of thing."

There is testimony tending to show that the car in question had been loaded before the receipt of defendant's order. Another dealer in fruits at Jackson ordered from plaintiff and received a car load of rejects from the same

steamer.   Defendant was permitted to introduce testimony which placed before the jury a comparison of this fruit with the fruit sent to defendant, and to make use of the fact, appearing in certain documents in evidence, that the fruit in the car consisting of the same number of bunches and sold at the same price, weighed some 2,200 pounds more than that sent to defendant.   It appears, also, that in forwarding the order of this other dealer from Detroit to New Orleans there was added by the plaintiff's agent the words, "Don't ship if fruit poor."   It is contended that this telegram was not in evidence but was improperly used by counsel for defendant in his argument to the jury. It is not disputed that bananas of the class "reject nines," "cargo run," will vary somewhat in quality and condition, and that unavoidably a few bunches of lower grades become mixed with a car of "rejects."   The court gave the defendant's fifth request, which was:

"If you should believe that the plaintiff has shown by a preponderence of the evidence that the car in question was sold to the defendant under the terms of the contract of June 12, 1901, then I charge you that the plaintiff was bound to send to the defendant upon his order a car load of mailboat rejects, cargo run, and it must send the defendant mailboat rejects, cargo run, under any view of the case."

And he refused to give the following request preferred on the part of plaintiff:

"I instruct you that the language 'regular cargo run' as used in plaintiff's telegram to Le Seno of August 24, 1903, does not refer to the kind or grade of bananas but to the quality of bananas, and, if the agreement of June 24, 1901, was in force on that day, the defendant Le Seno would not have a right to reject them for the reason that they were not 'regular cargo run,' provided they were mailboat rejects."

He did charge the jury as requested by plaintiff's counsel:

"If the bananas when loaded into the car at New Orleans, and, when delivered to the railroad company,

were mailboats rejects, cargo run, and the agreement of June 12, 1901, was in force, then I charge you that the defendant, Le Seno, was bound to receive them, no matter what their condition, or quality, when they reached Jackson."

A motion for a new trial was made and denied, and the record, with 44 assignments of error, has been brought into this court for review.

*Charles E. Townsend*, for appellant.

*John Henigan* (*Richard Price*, of counsel), for appellee.

OSTRANDER, J. (*after stating the facts*). Because plaintiff conceded the right of defendant to refuse the fruit if it was not of the class or grade "reject nines," we need consider only whether, the agreement of June 12, 1901, being in force, he might also refuse the fruit if it was not "cargo run." Some effect must be given to the contract for the particular car of fruit and to the understanding of the parties to be gathered from the terms employed. The order was, in any event, for mailboat rejects or "reject nines." As given, it asked also for select stock. The reply was that the sellers would not select fruit for any one, and that, if defendant wished the fruit, he must take "regular cargo run." Upon these terms, the fruit was sold. It is clear that the term "cargo run" does not mean the same as average of the cargo or imply that the fruit placed in a particular car will be as good as that placed in some other car. This is made plain when it is considered how the fruit is loaded and unloaded. It is taken on board at various ports and placed according to grade in various compartments. A compartment filled with "nines" might receive fruit from many different ports. It is unloaded, evidently, in the inverse order of loading, and carried directly to cars, or, if then unfit for shipment, thrown upon the dock. Full and heavy bunches of fruit are graded precisely as lighter and leaner bunches

are graded; the bunches vary considerably in weight, and the greater weight may result from maturity of the fruit. The term "cargo run" is not significant of quality, condition, or class of fruit. In this contract, it had no meaning other than taking the fruit of the grade or class ordered as it came from the vessel, with such inspection as was given the fruit, generally, at the dock. If the condition or quality of the fruit was not satisfactory to the buyer, and the agreement of June 12, 1901, was in force, he was bound to accept the fruit if it was of the grade or class ordered, pay for it, and submit a claim. The court was, therefore, in error in ruling otherwise.

We have examined the contention of appellant which relates to the subject of the abrogation of the agreement of June 12, 1901. It is the claim of plaintiff that it was not in any way abrogated or superseded. It is a further claim that, if it was, by filing on July 26, 1903, a claim for allowance for bad fruit which he had accepted and paid for, defendant waived the provisions of any new or other agreement and by his conduct indicated and led plaintiff to believe that the parties were dealing with reference to the earlier arrangement. The court was requested to charge that, by putting in this claim, defendant waived any new or other arrangement. The court properly refused to so charge the jury. It cannot be said, as matter of law, that the parties were dealing under one rather than another arrangement. It can be said that the agreement of June 12, 1901, is conclusively established, and that, as late as July, 1903, the conduct of plaintiff and of defendant was in conformity therewith; that, under the circumstances, it was to be considered as in force for the entire period, and in August, 1903, unless defendant made the contrary to appear.

Nor, if the subject shall again be considered, can it be said, as matter of law, there was no testimony tending to prove that the fruit delivered to defendant was not "cargo run." The fact that the bananas sent to the other dealer weighed more than those sent to defendant would not,

standing alone, warrant submitting the question to the jury.    But this considerable difference in the weight of the fruit is significant when considered with other of the testimony.    If defendant and his witnesses are to be believed, the fruit sent defendant was in every way inferior to that sent to the other dealer.    If it was not fruit properly classed as "reject nines," the difference is accounted for, and the matter disposed of.    If both cars were properly graded as "rejects," the testimony, some of it, if believed, supports the inference that the other car was filled with selected fruit.

Other errors assigned are not likely to arise upon a new trial.    The judgment is reversed, and a new trial ordered.

The bill of exceptions appears to be, substantially, a copy of the stenographer's minutes of the trial, and the printed record contains 394 pages.    Counsel for defendant consented to its settlement, and the trial judge certified that, where the testimony is set out by questions and answers, such course was necessary to a full understanding of the questions of law.    The questions of law could have been properly presented with a record of 100 pages, and the costs of appellant will be taxed upon the basis of such a record.

CARPENTER, MONTGOMERY, HOOKER, and MOORE, JJ., concurred.